Good morning, Your Honors, and may it please the Court, John Malgren, on behalf of Plaintiffs' Appellants, Cascadia Wildlands, et al., I intend to reserve approximately three minutes for rebuttal and will keep my eye on the clock. This appeal presents three issues for the Court to resolve. First, whether a federal agency sending federal employees into the field with federal equipment is a major federal action such that NEPA applies. Second, and if so, whether Wildlife Services took a hard look at the environmental impacts in its environmental assessment. And third, whether Wildlife Services' statement of reasons justifying its decision to not prepare an EIS was sufficient. I will address each in turn. Before we do that, I just want to make sure I'm familiar with what phase we're on right now. I understand that the briefing was focusing on Phase 2, but now they're into Phase 3. Is that correct? It's confusing because Oregon is divided into two zones. There's the Eastern Zone and the Western Zone. The Eastern Zone is currently in Phase 3. The Western Zone, where wolves retain Federal Endangered Species Act protection, is still in Phase 1. And additionally, as the District Court determined, there was a risk that the Eastern Zone could revert back to Phase 2 because of the reduction in packs and breeding pairs around the time of the summary judgment proceedings. Okay. So the argument would be is that there's a likelihood that even though technically in the Eastern Zone we're in Phase 3, it could very easily drop down to Phase 2 at a moment's notice. Correct. And additionally, in Western Oregon, it's very possible, and in fact, Wildlife Services in the environmental assessment states that it's likely that wolves will be federally delisted and therefore Wildlife Services could provide the services throughout the state of Oregon. Okay. Thank you. So as to major federal action, in this case, Wildlife Services presents a post hoc litigation position not articulated during the administrative process that even though it spent considerable resources preparing an EA for its wolf damage management program in Oregon, as the agency does routinely across the country, it never had a legal obligation to do so, and therefore this court cannot review the EA for compliance with NEPA's strict requirements. I would like to focus on three of the reasons why this argument must fail. First, Wildlife Services' decision notice is final agency action subject to judicial review. Second, Wildlife Services and the district court ignore that the decision notice authorizes the agency to provide wolf killing services to not only the Oregon Department of Fish and Wildlife, ODFW, but also to sovereign Indian tribes and private landowners. And third, the authority relied on by Wildlife Services to support its novel theory is an apposite in that it relates to non-federal action as opposed to federal action like we have here. So, first, the Administrative Procedure Act confers a legal right on any person suffering legal wrong because of agency action to seek judicial review of that decision. Here, Wildlife Services unquestionably issued a decision notice outlining its anticipated wolf killing operations in Oregon, and as the district court held in concluding that Cascadia had Article 3 standing to bring this litigation, Cascadia through its members has suffered actual and procedural injury caused by Wildlife Services' decision notice. This is uncontested on appeal. The APA therefore anticipates that Cascadia's claims pertaining to the adequacy of the environmental analysis underlying the decision notice can be reviewed by a federal court. If this court were to hold that Wildlife Services' decision notice was not final agency action subject to judicial review, it would, for the first time in NEPA's 40-plus year history, create an enormous loophole allowing federal agencies to avoid environmental review of its actions as otherwise required by NEPA. Additionally, all of Wildlife Services' grounds for asserting that its Oregon wolf killing program is not major federal action relate to its provision of such services to the Oregon Department of Fish and Wildlife. But even if this court were to agree with that argument, it ultimately still must fail because at a minimum it's major federal action as it relates to sovereign Indian tribes and private landowners. Wildlife Services makes no attempt to argue that there is no major federal action should it provide such wolf killing services to either of those groups. And further, the authority relied on by Wildlife Services to support its major federal action argument relates to non-federal action and the amount of money that can federalize an otherwise non-federal action. Both Friends of the Earth and Kamehameha relate to actions taken by state actors and not a federal agency. In both cases, the only federal involvement was the provision of money in the form of a federal grant to help pay for the underlying project. Otherwise, aside from a minor advisory role, there was no federal agency involved in the actual construction and implementation of the infrastructure projects at issue in those cases. Here, by contrast, there is actual federal action. Wildlife Services anticipates sending federal employees using federal equipment into the field to kill wolves in Oregon. While- Counsel, can we focus on the funding aspect for a minute since that's a really critical component? Sure. Yes, Your Honor. The contract says that Oregon will reimburse the federal government for up to $100,000 in costs. Is that what's actually going on or in practice? We don't have any information in the record specifically about what the amount of money Wildlife Services is paying to the state beyond the brief citations provided by Wildlife Service, which kind of take a variety of different documents to try to come up with the amount of funding. So here, all we know is that there's this cap on the amount that ODFW will pay Wildlife Services for its services. And importantly, that $100,000 is over a two-year period and includes not just the wolf aspect of the program, but also lethal removal of bears, cougar, and other furbearers. And so our position is that it's just simply unreasonable to assume that there's unlimited funding with the state of Oregon to pay Wildlife Services for its services. So do you have any information in the record about what percentage of resources that Wildlife Service, APHIS, is contributing to this project as opposed to what the state's contributing? That is not in the record, Your Honor. The closest we get is what Wildlife Services provided to the court to get at this 8% number that it asserts. And we just think that's completely an apposite here, primarily because the years in which that happened, there was no wolf killing in Oregon. So I think it provides a very skewed perspective of what the funding aspect would be in years where there is wolf killing, which is much more expensive because of the equipment aspect and the manpower required for those operations. And it requires helicopters and what are the kinds of resources that it requires? It really depends on the facts on the ground, but it could be using a helicopter to conduct aerial gunning operations. It could be sending employees into the field to set leghold traps and snares. Or it could also be employees sitting in the field with rifles to shoot a wolf in the event that they were to see one. And so it really depends on what exactly is going on on the ground. And so, again, I think it's really questionable as to exactly how much that would cost were that to take place. And there's no information in the record discussing the specific financials in years where there would be wolf killing. Could I ask you to go back to what you said about the environmental assessment is done routinely across the nation on this kind of situation. Whereas, as I understand it, your opponent is arguing that they didn't have to do the environmental assessment and they did it only because of the settlement of a different case. So, if they are, where do you rest your, where is the law that says they had to do an EA in this instance? Yes, Your Honor. So, the statement about how they routinely do it across the country, I think that's evident through the various judicial decisions from district courts about wildlife services activities. There's the Woodruff decision from the Western District of Washington analyzing an EA for wolf killing, the Idaho decisions, the Nevada decision from this court in the Wild Earth Guardians case. Okay. I understand that. But they're saying that in this case there was no requirement, that they have discretion to decide whether, the agency has discretion to decide whether to do an EA. And clearly, I would say clearly the rules are kind of unclear about what that means. It's basically committed to the agency to decide. Well, I'd say, Your Honor, that the discretion to the agency to make that determination is not clear and that, you know, the case law, as I was discussing earlier, the case law Friends of the Earth and Kamikani relate to non-federal action and federal contribution of money to federalize that non-federal action. But here, there is a federal action and, to my knowledge, there is no case directly on point addressing that situation. But I think it's clear that based on the funding question, the questionable nature of how much is actually going to be reimbursed, the discretion to the agency in terms of deciding what methods to employ, how exactly they're going to conduct these operations and all that, and additionally, there's the fundamental and primary discretion of whether or not they even accept the request to kill wolves. Wildlife Services has that discretion to say, no, we're not going to do that. There's no requirement that if ODFW says, hey, Wildlife Services, can you please go kill wolves for us, they don't have to say yes. They can, they have the discretion to say no. And so, I think there's enough evidence here that it is a major federal action because of the discretion left to Wildlife Services and the fact that this is federal action, not non-federal action. So, if we decide that it was discretionary to do the EA and then they make the FONSI decision, is that still appealable? Yes, I think so, based on my first argument that it's final agency action subject to judicial review. They issued a decision notice. There was no indication in the record that they didn't think they had an obligation to do this. This was purely brought up in litigation. Wildlife Services reached out to other agencies and tribes for official cooperator status in preparing the EA. They solicited public comment and comment from other agencies. Based on my reading of the record, I think it's very clear that Wildlife Services thought they had an obligation to comply with NEPA and that it was major federal action and that it was just brought up as a litigation argument for why there's no jurisdiction to hear the case. Unless there's further questions on major federal action, I think I'd like to turn to the NEPA claims here. So first, as to the sufficiency of the environmental effects analysis in the EA, Wildlife Services failed to take a hard look at several categories of effects, including wolf populations, non-target animals, and ecosystems. Wildlife Services makes two primary arguments to justify the lack of analysis. Even if it does not kill wolves, ODFW or Indian tribes will kill wolves, so any effects from wolf killing is part of the status quo and need not be analyzed. And second, that wolf populations will continue to grow even with its wolf killing program, so no impacts. But these arguments must fail. As articulated by Judge Bryan in the Woodruff case, these arguments, quote, ignore Wildlife Services' shared responsibility and discretion and assumes a specific but uncertain outcome if Wildlife Services does not provide the assistance. And further, the growth in wolf population reasoning was also explicitly rejected by this court in Anderson v. Evans. There, this court reviewed an agency decision allowing whale hunting by members of an Indian tribe and this court concluded that just because other whales may come into the area to replace the whales that were harvested and that there would be no impact on the broader whale population, that does not mean that there's no potential for localized impact that need not be analyzed in an EA. Specifically on wolf populations, although Wildlife Services points to parts of the EA where this analysis purportedly occurs, review of the EA shows that it is lacking. There's no disclosure or analysis of the number of wolves it and others have killed in these states. For example, the Idaho Department of Fish and Game and recreational hunters kill wolves in Idaho. There are easily accessible data available as to the amount of wolf killing in these states and disclosure of these data and an analysis of what they mean should be a critical piece of the EA's effects analysis. As Wildlife Service admits, Idaho remains a source population for Oregon's wolves and Wildlife Services relies on this source population to justify its failure to disclose and analyze environmental effects. It is completely reasonable for the public to ask an agency to conduct an environmental analysis that crosses state lines, especially since, as Wildlife Services admits, Oregon's wolf population depends on migrants from other states. And because I'm running out of time, I'd just like to reiterate also that all these effects are very significant under all the significance factors and those should be considered cumulatively, not individually, as Wildlife Services asserts in its briefing and in the record. And with that, I'll reserve the remainder of my time for rebuttal. Good morning, Your Honors. May it please the Court. My name is Sean Martin. I'm an Assistant U.S. Attorney for the District of Oregon and I'm here on behalf of the defendants. In short, the District Court got it right. NEPA was not required and even if NEPA was required, the record shows that Wildlife Services undertook a rational, thorough environmental assessment and it reached rational findings regarding the significance of assisting the State of Oregon under the Oregon Wolf Plan. Now, Judge Owens, to follow up on Mr. Malgren, you raised an initial question about the current phase of wolf management in Oregon and just some additional information about that. First, what Wildlife Services proposed here and what's under review is only assisting Oregon where Oregon's the sovereign, where Oregon's managing the wildlife because it's state control, so where it's federally delisted. So we're really talking about Eastern Oregon and at the time of the District Court ruling, the State had moved to Phase 3 and as of the latest wolf numbers from the end of 2017, I can tell you that there are now 11 breeding pairs and 124 wolves. What Judge McShane reviewed was 112 wolves and 8 breeding pairs in 2016, so the end of 16. So the bottom line is Oregon is still very much in Phase 3, well into Phase 3, and as a result, Wildlife Services is not assisting at all with wolf removal under the Oregon Wolf Plan. But that can change at any time, right? It's certainly, I wouldn't rule out as an absolute impossibility, but it appeared that Judge McShane gave the benefit of the doubt that, you know, when there were 8 breeding pairs, that if it goes down below 7, we could be in Phase 2 again. But what the government submits is that the further development of the breeding pairs makes that even less likely. We haven't raised mootness to the Court, but I bring that up in the spirit of the Court wanting to undertake its own review of mootness given the changing facts on Phase 3 and the fact that the State is further into Phase 3. Now, what I'll start with, you know, tracking Mr. Melgren's argument in some ways is that whether NEPA was required in the first place. And the paramount factor here that the Ninth Circuit has looked at is supervision and control by the federal agency over the non-federal activity. Now, here, that type of control is absent. You know, as I was mentioning before, Oregon has complete supervision and control in managing wolves in eastern Oregon, the area at issue here. And it, on its own, developed the Governing Wolf Plan and the state regulations that are very specific about when wolves are going to be considered problem wolves, where they can be removed. And that is, those judgment calls are left up to Oregon and Oregon alone. I was curious, Counselor, there was, I believe, an April 2011 settlement where the federal government agreed to prepare either an EA or a full-scale EIS. In light of that settlement, how does that affect our analysis as to whether there is a major federal action here? Well, you know, the government did what it said it would do to resolve that litigation. It said it was going to do an EA, and it did so. That doesn't change NEPA or the case law about what creates a requirement that NEPA be performed as a matter of law. And I would point out that this Court, in fact, has reviewed a situation where a federal agency did an EA and a finding with no significant impact. But nevertheless, this Court determined that NEPA wasn't required in the first place, even though the agency had done that. And that's the case of Sierra Club v. Babbitt, 65 Fed 3rd, 1502. That's a 2002 case. And that's a case cited in the Kamakani case, which is really central to the argument that whether NEPA is required really focuses on whether the federal agency has the control over the nonfederal actor here. And something, you know, that really supports that NEPA wasn't required here is that the record shows very plainly that Oregon told Wildlife Services that it's going to remove problem wolves, whether or not Wildlife Services is there to help out as its agent. So it might not do it as quickly, but the State made clear it's going to go ahead and do it anyway. And the district court reflects that as well, that Wildlife Services actually hasn't removed any wolves after this 2014 decision. And, in fact, Oregon has gone ahead and done so independently under its program, under its authorities. Now, if I might briefly address some of Mr. Milgram's specific points about why he thought NEPA was required here. He said, well, there's so much discretion about the methods that Wildlife Services undertakes in the field, whether it's a snare or a foothold trap. And we would disagree that that really rises to the level of control over the nonfederal actor. It's really limited discretion, as Judge McShane reviewed. And that's highlighted by the fact that the record contains take permits that Oregon gave Wildlife Services that circumscribe the kinds of trapping and the types of methods it can use in the field. And that is found at ER 561, 562. The EA very plainly lays out the specific methods that could be used and makes clear that those are nationally recognized methods. So these aren't some sort of surprise techniques that aren't well known to all wildlife managers. And, in fact, Oregon has reviewed and okayed or not specific methods, as I was just mentioning. The EA at ER 365 also indicates that, unsurprisingly, that Wildlife Services would only use, quote, allowable methods and will consult with Oregon on the methods. Mr. Milgram made the point, well, it's not just assisting the state as the state agent. It's helping the tribes out. But that doesn't change the outcome that NEPA wasn't required because the tribes of the Umatilla Reservation, their sovereigns over their land, Wildlife Services wouldn't be controlling, making the judgment calls about problem wolves there. Instead, the tribes would, as the sovereign, just like Oregon would for the areas of the state that aren't under tribal control. But what about private individuals? Okay. Yes, so there's also an allowance for what's called caught in the act permits. But, again, Judge Lefkoe, that requires that that private individual receive a state permit. So the state decides whether or not it's going to give a caught in the act permit to a private individual. And then it's not, so it's really, Wildlife Services isn't going to play any role in whether or not that individual gets a permit to allow take of a, the only involvement might be the landowner, once it has the permit from the state of Oregon, could say, I'm going to designate Wildlife Services as my agent to carry out my state permit. Similar to, you know, the rest of this very limited scheme. That it's really the state is calling the shots. Why, can I ask a question about why the state would want to enter into this agreement with the federal government? I mean, if it's controlling the shots and it's utilizing its own measures and issuing its own permits, why did it need to involve the federal government at all? Well, because it wants to carry out its wolf plan with all of, I guess, all of the aspects. And, you know, I think it's concern, it's in the record, Judge, at ER442, a letter from the state of Oregon to Wildlife Services, that I think its concern was if it's doing everything on its own, it's going to do lethal removal where it has to, but it's going to take some resources, state resources, away from other parts of the wolf plan. The state believes all of it is important, that it's an integrated program. It's not just removing problem wolves. It's the steps before that are education, other kinds of technical assistance. So the way the state looks at it is it could use the help to make sure the plan is done in its most robust way with all of the elements in place. Now, unless the panel has questions about the sort of the NEPA trigger and the threshold for NEPA, I'll move on to the merits. You know, I'll say up front that Wildlife Services took the, you know, it may not legally have been required to undertake NEPA review, but it didn't cut corners and it took its work seriously. It asked early on for agency input. It then separately asked the public for input. It put together a response to public comments that went on for, I believe, about 20 pages, and it as part of an EA that is about 170 pages all told that looks at various issues and looks at the alternatives and points out an important underlying factor, Your Honors, that the primary limiting factor for whether wolves survive in Oregon is human tolerance. You know, that if wolves are going to make it here, the most important factor is whether people can accept that, that they have a means of redress if their livelihood, their economic interests are being impaired by wolf conservation, that there is a way to resolve that under certain circumstances while still managing this wolf and allowing it to be conserved now that it's back and it's growing in the state of Oregon. The bottom line is, in terms of the hard look on wolf populations, Wildlife Services EA took a hard look. It rationally found at ER 387 that there wouldn't be any effect on the overall northern Rocky Mountain population of the wolf, and it rightly looked back at decades of management in the western Rocky Mountain states, which has involved lethal control of problem wolves, but has also resulted in great recovery for the wolf populations. And, you know, even in Idaho, which Mr. Melgren pointed out has robust lethal removal of wolves, the wolves are still surplus and they're actually coming into Oregon from Idaho. So that Idaho population is basically saturating the state of Idaho and moving into Oregon, the point being that limited removal under state direction and control, whether it's just the state or the state with some assistance from its agent, Wildlife Services, isn't going to impair that trend, isn't going to endanger the wolf population. And Wildlife Services consulted with the Fish and Wildlife Service, and Fish and Wildlife Service agreed that the federally listed wolves in western Oregon aren't going to be harmed by what Wildlife Services would be doing to help Oregon and eastern Oregon where it's under state control, that the wolf populations in Oregon will continue to increase. Now, it's always possible to ask an agency to be more specific and say exactly how many wolves in exactly how many states, but under an EA, the NEPA regulations are pretty plain that you focus on the essence and it's not about the number of pages or excruciating detail. What's material here? What's the most important findings that inform the agency and let the public know what the agency is looking at? And here, the plaintiff's arguments are what they are, that yes, you could do more, but the bottom line is they haven't rebutted in any way that this type of limited assistance to the state isn't going to affect either the Oregon population of wolves or the overall northern Rocky Mountain population segment. As for the hard look on the non-target species, lynx, bears, coyotes, ER 388 through 90, those pages, especially of the EA, those pages looked at that question and Wildlife Services explained why for various sized animals and given the specifics about the trapping methods and about where this work is going to happen, that it didn't believe there would be major effects and it explained why. And in the response to comments, that is ER 488, there was even more specific information that non-target animal captures in 2011 accounted for less than 2% of all animal captures within the state of Oregon by Wildlife Services. So the point is that it took a look at the effects. It also consulted with the Fish and Wildlife Service. How is this work for the state-listed wolves, state-managed wolves? How is that going to affect the lynx? Because that is a federally protected species and Fish and Wildlife Service said at most minimal effects on the lynx. As I said earlier, Wildlife Services asked Fish and Wildlife Service what about the federally listed wolf in western Oregon? Is the work on behalf of the state of Oregon, how is that going to affect the federally listed wolf? And the Fish and Wildlife Service said it's going to have an extremely minimal effect because the listed part of the state, wolves there are non-target species. Just so I'm clear about that. Now, does the panel have any questions about the significance factors? That's not something that Mr. Melgren raised in his argument, but I think it's been well briefed by the parties. So unless Your Honors have any further questions, the defendants ask that you affirm the district court. Thank you. Thank you. Thank you, Your Honors. In my brief time here, I just want to touch on a couple issues. Judge Wardlaw, you specifically asked why would the state of Oregon want to enter into this agreement. And the answer to that is it's cheaper. Wildlife Services says it has expertise that the state of Oregon does not have. The state of Oregon would have to redirect funding and resources, as its letter to the agency says, and further tribes say that they rely on Wildlife Services for expertise and equipment. So it's clear that Wildlife Services plays a much bigger role in this program than it would lead you to believe through its briefing. As to the effects on wolf populations, again, I want to point the court back to Anderson v. Evans. It explicitly dismisses this line of reasoning from a federal agency about just because more animals might come in to replace that population that there's no effects. There might be localized short-term impacts, and those need to be required. Additionally, you heard from counsel that some of the effects might be minimal. But, again, I want to emphasize minimal does not mean no effects. And even with minimal effects, which we disagree that there are, those should still be analyzed. We respectfully ask the court to reverse the district court's decision and order the district court to vacate the decision notice and environmental assessment. Thank you. Thank you very much, counsel. Thank you both for your argument today. This matter is submitted, and this panel is in recess until tomorrow at 930.
judges: Wardlaw, Owens, Lefkow